## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN
## DISTRICT OF TENNESSEE WESTERN DIVISION

---

**CHURCH OF GOD IN CHRIST, INC.**
**individually, and;**

**BOARD OF DIRECTORS also known as**
**GENERAL BOARD OF CHURCH OF**
**GOD IN CHRIST, INC.**

**JONATHAN SAFFOLD, JR., individually and as**
**GENERAL COUNSEL OF CHURCH OF**          **No:  2:25-cv-03029-MSN**
**GOD IN CHRIST, INC.**

**Plaintiffs,**

**vs.**

**MOSES TYSON, JR.**

**Defendant.**

---

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
### POST REMOVAL FROM SHELBY COUNTY CHANCERY COURT

---

Comes now Plaintiffs, by and through undersigned counsel, would file their Brief in

Support of Preliminary Injunction after removal from Shelby County Chancery Court on

November 10, 2025, pursuant to Fed. R. Civ. P. 65 and the Local Rules of the Western District

of Tennessee, and in support would state as follows:

### <u>INTRODUCTION</u>

On October 31, 2025, Plaintiffs filed a Complaint alleging in relevant part that Defendant,

Moses Tyson, Jr. had engaged in a campaign of dissemination of false information that amounts

to defamation through libel and slander. As a result of Defendant's defamatory actions, Plaintiffs,

who are a national Christian denomination of churches, have experienced significant reputational

harm and a decline in charitable giving required for the functioning and operation of the denomination. In the Complaint, Plaintiffs first request entry of a Temporary Restraining Order and Preliminary Injunction, restraining Defendant, and all persons acting in concert with him, from publishing, broadcasting, or disseminating any further defamatory statements, including any references to "thieves," "grand theft," "elder abuse," "fraud," "groupies," or any other statement of similar defamatory import.

Also on October 31, 2025, the Temporary Restraining Order was entered, and the matter was set for hearing on November 12, 2025. Since the matter has been removed from the jurisdiction of Shelby County Chancery Court on November 10, 2025 and prior to the hearing, Plaintiffs respectfully request that this court give full faith and credit to the prior FIAT until further hearing.

## STATEMENT OF RELEVANT FACTS

It is important to first define the relevant parties named in the Complaint. The Church of God in Christ, Inc., ("COGIC") is a Christian organization in the Holiness-Pentecostal tradition and is the largest Pentecostal denomination in the United States, with its headquarters in Memphis Tennessee. The General Board of the Church of God in Christ ("General Board") is an internal body that makes final executive decisions as part of the Executive Branch of COGIC in Memphis, Tennessee. Bishop John Drew Sheard is the duly elected Presiding Bishop of COGIC, and thus, the leader of the worldwide organization. Finally, Jonathan Saffold, Jr. is the General Counsel of COGIC.

Defendant for his part has performed and recorded with countless gospel, soul, funk, R&B, and inspirational artists. Defendant is also active in the business end of the industry, putting together his own albums and setting up his own independent label, World Class Gospel. As such, he has a rather influential and widespread platform that reaches a number of individuals.

Additionally, Defendant has a longstanding history with COGIC as a pastor and bishop, resulting in a following across the denomination.

Beginning on or about August 2025, and continuing relentlessly to the present, Defendant Tyson commenced a widespread, malicious, and damaging campaign of false communications. (Complaint, ¶ 12). Defendant's publications were disseminated nationally and internationally via mass emails, YouTube videos, and social media postings, ensuring the defamatory statements reached vast numbers of individuals, including COGIC members, clergy, and the general public. (Complaint, ¶ 13).

The core of Defendant's false campaign involves reckless allegations of serious, felonious crimes. Specifically, Defendant has repeatedly accused Plaintiffs, including Bishop John Drew Sheard and other bishops, of being "thieves," engaging in "grand theft," and committing "elder abuse"—allegations that are demonstrably false, deeply criminal in nature, and constitute the most damaging form of defamation. (Complaint, ¶ 14).

      A.    <u>Defendant's Defamatory Emails</u>.

Defendant has sent out a number of emails to hundreds of individuals making defamatory claims.

<u>July 15, 2025</u>.[1]

Defendant sent an email to 32 people in which he stated in part,

"I predict COGIC INC will be brought to OPEN SHAME soon, if we stay on this course.  THESE ARE CRIMES that the "DOCUMENTED FACTS" can prove …"

"The calls I am getting right now, is really "EMBARRASSING" and if the general public reads this stuff, they are going to think that COGIC INC, is ran worse than a 3rd World Banana Republic."

---

[1] Attached as Exhibit 1.

<u>August 17, 2025</u>.[2]

In this email sent to 8 individuals, Defendant asserts that COGIC tried to "steal WEST SIDE FOR YEARS" and that Defendant was dealing with "unholy callous men." He further stated that "all involved should be FIRED and reported to the POLICE FOR ELDER ABUSE." He concluded the email by informing the readers about "WHAT LIARS WE DEAL WITH IN THE COGIC ORG."

<u>July 27, 2025</u>.[3]

Defendant sent an email to 30 people in which he asserted,

"COGIC INC, has "AGENTS", who have engaged in MILLIONS IN THEFT from trusting people, STOLEN CHURCH ROPERTIES SOLD & THE MONIES NOT GIVEN TO THE LOCAL CHURCH OWNERS, and worse."
…

"The COGIC CULTURE, gives power to Bishops & Agents, THEY DO NOT LEGALLY HAVE. LYING TO THE SAINTS OVER THE PULPIT, TAKING OFFERINGS AND MONIES DUE RIGHTFUL PEOPLE, IS THE NORM, but the "SECULAR LAWS THAT GOVERN OVER THE CORPORATION", allows for 3rd parties who try and "STEAL CONTROL" of the day to day operations of the church business, be "REMOVED", if need be."
…

"Wait until you see some files I am going to send you for your records, showing where COGIC AGENTS, just "RAZORED ALL OF THE WOOL FROM THE TRUSTING SHEEP", and then moved on, while other "WEAK SHEPPERDS" said or did nothing."
…

"So in the end, the only way COGIC INC, got the "attached Restraining Order, in addition to Bishop Kyles attorney failing to show up, is the fact that "YOU ALL INVOLVED "LIED SIR". You all LIED to the Judge in Houston, just like you all "LIED" to the Judge in Florida, when you all tried to "STEAL WEST SIDE PROPERTIES", on Feb 1st, saying they were no longer COGIC MEMBERS and that you all needed the PROPERTIES. HOW MANY MORE LIES are our OFFICIALS GOING TO TELL COURTS in order to STEAL WHAT DO NOT BELONG TO THEM"?"

---

[2] Attached as Exhibit 2.
[3] Attached as Exhibit 3.

Defendant concluded the email chain with the following: "I AM HERE, if you want to stay on this "FRAUDULENT ROAD", I will be there for you, God willing, when YOU ARE BROUGHT TO OPEN SHAME, for such diabolical ungodly behavior. Not only you, BUT ALL OF THOSE WHO HAVE SUPPORTED THIS SINFUL UNGODLY ABUSE and "ANY SAINT"! .... "Like with West Side, LIES, LIES, LIES on top of LIES, BY COGIC INC AGENTS & OFFICALS!"

August 27, 2025.[4]

Defendant sent an email directly attacking Plaintiff Sheard. In the email, Defendant stated that "Bishop Sheard and other Officials, based upon my files in this case", have engaged in "FRAUD, GRAND THEFT & ABUSE", against one of our "FATHERS" and "GREAT LEADERS" in our COGIC ORGANIZATION …"

The email went on to state,

"[W]e have victims of this type of SCAM, like West Side, where COGIC INC, its agent and our leadership, "LIED" to the court profusely for years trying to steal control of their 3 paid for properties and ministries, until finally the Judge ruled in their favor. Despite Bishop Sheard, Gen Counsel Saffold and others, KNOWING that they had "LIED" as to the facts of the case, they are refusing to pay West Side's more than $300.000.00 legal bill, defending themselves against COGIC INC'S, "FRAUDULENT ATTEMPT", to steal their properties and ministry."
…

"Then there is the case of Bishop Kyles. Mother Lewis, mam, I have the files to prove the "FRAUD, LIES & GRAND THEFT", against him, his Jurisdiction and Local Church. Now, Bishop Jenkins is refusing to turn over the helm back to the Legal Leader, Bishop Kyles. Bishop Sheard sadly sent a "FRAUDULENT LETTER", through Bishop Bryant, to read to the saints there at ET, "AFTER", Bishop Kyles had multiple rulings, that he was INDEED the Legal Pastor/ CEO of Evangelist Temple. Then they went to court Mother Lewis, and "LIED" to the Judge, in order to get a "RESTRAINING ORDER" against Bishop Kyles, from going within 500 feet of the church he pastored for over 30 years or so. God willing, I do plan to do an "IN-DEPTH" review of Bishop Kyles case online, so the "TRUTH" will finally come out and Bishop Kyles, take back the HELM. Not to mention he is owed easily over $2 Million Dollars, but for the "GRAND THEFT, FRAUD & ABUSE, Bishop Sheard, headed up, "AFTER" Bishop Blake left office."
…

---

[4] Attached as Exhibit 4.

"I have attached the letter showing Bishop Sample had already made that decision, in January, PRIOR to Bishop Sheard's, ILLEGALLY going to HTC, to undermine his "LEGAL AUTHORITY". At best, Bishop Sheard in my opinion and his cabinet should be made to take a TEST showing they even KNOW, their job descriptions. The only reason why I believe it's fraud, because I know, they wouldn't allow this to happen to them, in their role as CEO/PASTOR of their local perspective churches. If this CULTURE OF CORRUPTION, GRAND THEFT, FRAUD & ABUSE do not STOP, I predict COGIC INC, will be brought to OPEN SHAME, and once the FILES, are turned over to the proper authorities, some of these same men we see in ROBES, carry CROSSES & WEARING GOLD CHAINS, will be wearing ORANGE SUITS, and preaching in RYKERS prison."

…

"Bless you Mother Lewis, and I apologize for this lengthy letter, but sadly the "CRIMES & ABUSES ARE MANY" against our own SAINTS."

August 29, 2025.[5]

Defendant sent an email to a number of pastors and other individuals within the

denomination in which he asserted,

"Mind you sir, we have YEARS OF GRAND THEFT & FRAUD well documented going on within the COGIC INC, organization.
…
The games Bishop Sheard and his "SYCHOPHANTS" are playing inside the organization, are CRIMES in the REAL WORLD, and such "FACTUAL STATEMENT", will be proven soon, should we stay on this road.
…
As you are going to see as these video series continue, they have a HISTORY of LYING TO COURTS, in order to "STEAL CONTROL" of properties and ministries, that they have NO RIGHTS TO.
…
All of this will come out over time as we continue to EDUCATE our people, so they can protect themselves from the PREDATORY SPIRIT that permeates throughout the TOP LEVELS of COGIC INC, an organization, that I predict the FEDS will be going to MASON TEMPLE …
…
Please see where "AFTER", they ABUSED WEST SIDE, Gen Counsel Saffold, "attached minutes", later went to a meeting with Green, and LIED to the saints there, as to the FACTS of "WEST SIDE'S ABUSE". They yet have over $300.000.00 in LEGAL FEES, due to Bishop Sheard's and his SYCHOPHANTS, who allowed HIM as CEO, to allow the courts in Florida be LIED TO!"

---

[5] Attached as Exhibit 5.

<u>Sept. 6, 2025</u>.[6]

Defendant sent to over 50 people a copy of a letter he had sent to Plaintiff Sheard, in which

he wrote,

> "I only urge you NOT to send no GOONS to HT, trying to block Bishop Sample
> from carrying out his duties as Pres/ Pastor of HTC. If you do, they will be met with
> law enforcement and we will FILE every appropriate criminal charges against you
> all, for once again TRYING TO STEAL control of another non-profit organization,
> using FRAUDULENT BULLYING TACTICS! Thankfully, the many saints who
> have reached out to me, BELIEVE what I have said in the video uploads, and there
> is plenty more information to come. "
> …
> "I would hate for you to be IMPEACHED, as there are "LEGITIMATE
> CHARGES" filed against you as you know in this matter, and West Side may be
> forced to do so as well, given you left them with more than $300,000.00 in legal
> fees, a destroyed rental home & over 3 years of back rent to Sis. Huff, in COGIC
> INC'S, YOU & GEN COUNSEL SAFFOLD'S "FAILED ATTEMPT", to steal
> control of West Side 3 paid for properties, and their ministry."

Defendant further urged one congregation to sever ties with COGIC and stated.

> "We will recommend they spell out; the association with COGIC INC, is basically
> attending various " NATIONAL CONVENTIONS & PAYING DUES"! In
> addition, they best make sure there is NO TRUST CLAUSE associated with
> Memphis Headquarters, be NOWHERE NEAR their paperwork. Just like with
> HTC by-laws, they clearly spell out, HTC is a "STAND ALONE"! NO
> GOVERNANCE BY COGIC INC, so just that alone, nullify any document Bishop
> Sheard or Bishop McClelland gave to Elder Williams. I am really baffled as to why
> Bishop Sheard has failed to see the wisdom to pull the plug now and save the
> embarrassment their illegal actions will bring."
> …
> "In closing sir, I look forward to facilitating the Official public Installation of your
> successor. We can discuss all of this, prior to my return to Fort Worth. Thanks again
> Bishop Sample, for "trusting me" enough to assist you in this most "SACRED"
> matter. You are one of our "TREASURED FATHERS", and I apologize for the
> mistreatment you have experienced; HOWEVER, I am convinced that "GOD" may
> have allowed it, in order to expose the abusive culture that permeates within our
> organization, in such matters. Paid for properties, worth Millions of Dollars, money
> in the bank & then National Officials conspire to illegally gain control of the
> SPOILS, to divide among "disqualified people". God has his way of EXPOSING
> AND CLEANING UP, corruption, and I am sure YOUR NAME, will be called

---

[6] Attached as Exhibit 6.

when those coming behind us, read how you took a "COURAGEOUS STAND", against those who tried to "BLOCK THE DIRECTIVES" GOD, gave to you, as you move into the next phase of your life & ministry."

Oct. 29, 2025.[7]

Defendant sent an email to over 30 people in which while addressing the Westside matter stated "that entire case was the result of "FRAUD, LIES & ABUSE", by our Leadership & you Gen Counsel Saffold."

He further stated,

"General Counsel Saffold sir, I regret rather than just be honest, OUR LEADERSHIP chose to continue down the "FRAUD ROAD" and then use "INTIMIDATION TACTICS" to try and "SHUT UP" those who are not afraid to "STAND ON TRUTH". The cops were called on me in Fort Worth when the Legal Pastor, Bishop Sample invited me into his local church office, and the "FRAUDULENT APPOINTMENT PAPER", the Presiding Bishop & Bishop McClelland gave to the Elder, LYING SAYING he is the Pastor of Holy Tabernacle, was used to secure a fraudulent CTW against me, of which I have had to retain an attorney to get it lifted, by showing that INDEED, you Gen Counsel Saffold, Bishop Sheard & Bishop McClelland, actions are indeed "ILLEGAL, FRAUDULENT & DOWN RIGHT WICKED. This should NOT be happening, but because in my opinion, your consciousness is "WAXED FROZEN", you fell nothing of the ABUSE you are engaging in against Bishop Sample, nor Bishop Kyles. There are others, but them are the main two, I am focused on right now in this note to you!"

He further acknowledged as to the uncertainty of his accusations as stated, "Anyway, God bless you all, and "IF" anything I said in this attached interview is not correct, PLEASE let me know, so I can correct it. I am making "SURE" that my statements are backed by the "LAWS & LEGAL DOCUMENTED BEHAVIOR", of those involved in these various "UNGODLY MATTERS"

Defendant also appears to acknowledge church structure which undermines portions of his YouTube videos where he claims COGIC is liable for wrongdoing at the local church level. Specifically, the email states,

"The local church non-profit organization as you well know sir, has no LEGAL TIES, to Memphis Inc. No National Officers are on the bank accounts, deeds or bills and they have no responsibility for the SOLVENCY of the local churches!"

---

[7] Attached as Exhibit 7.

B.    Defendant's Defamatory Videos.

Additionally, the Defendant's pervasive activities on YouTube have amplified his malicious message, repeatedly accusing the Plaintiffs and the organization's leadership of felonious and criminal activities, resulting in ongoing, irreparable reputational and financial harm. (Complaint, ¶ 18). For instance, Defendant appeared on The Juice Radio and Talk Show on YouTube on October 26, 2025.[8] During the interview, that was viewed by over 7,700 individuals, Defendant stated that COGIC attempted to "steal Westside property" when the congregation tried to leave COGIC with the real property where the church was meeting. He further stated that COGIC's "agent" in a Florida church stole over $600,000.00 and that COGIC refused to repay the stolen funds.

Further, On October 30, 2025, a day before the current lawsuit was filed, Defendant made another appearance on The Juice Radio and Talk Show on YouTube.[9]  This interview has been viewed by more than 2,200 people. During the interview Defendant stated that COGIC had illegally taken local church property, had presented false documents to courts, and had illegally removed pastors. Defendant further stated that COGIC had "abusive agents" taking advantage of local churches. He stated that "someone would probably be going to jail." He stated that he had files showing "millions of dollars in theft" – eluding that it was COGIC who committed the thefts and had covered it up. Defendant repeatedly stated that COGIC had committed "abuses" against the local churches, including elder abuse of a senior pastor in Texas.

The publications are profoundly damaging to Plaintiffs' reputations, as the integrity of the Board of Bishops and the corporate structure is necessary for the spiritual stability and smooth

---

[8] *Available at* https://www.youtube.com/watch?v=kDfuxaiUOS4
[9] *Available at* https://www.youtube.com/watch?v=qD7LiJx4upg

operation of the entire organization, from the national corporation down to the jurisdiction and district levels. (Complaint, ¶ 17). Defendant's repeated invocation of the COGIC brand, insignia, and ecclesiastical authority in his defamatory broadcasts has created the false appearance of an internal Church investigation or sanctioned communication. These misrepresentations have caused confusion among COGIC members, pastors, and the public, leading to reputational harm and dilution of COGIC's goodwill as a globally recognized religious body headquartered in Memphis, Tennessee. (Complaint, ¶ 19).

## LEGAL ANALYSIS

The Tennessee Rules of Civil Procedure provide:

A temporary injunction may be granted during the pendency of an action if it is clearly shown by verified complaint, affidavit or other evidence that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action, or that the acts or omissions of the adverse party will tend to render such final judgment ineffectual.

Tenn. R. Civ. P. 65.04(2) (2005).  The following factors generally must be considered by the trial court when deciding whether to grant a preliminary injunction:

(1) the threat of irreparable harm to the plaintiff if the injunction is not granted;

(2) the balance between this harm and the injury that granting the injunction would inflict

on defendant;

(3) the probability that plaintiff will succeed on the merits; and

(4) the public interest.

Robert Banks, Jr. & June Entman, Tennessee Civil Procedure § 4-3(j), at 4-22 (1999) (emphasis added); see also *Johnson v. City of Clarksville*, No. M2001-002273-COA-R3-CV, 2003 Tenn.App. LEXIS 413, at *11, 2003 WL 21266937 (Tenn. Ct.App. June 3, 2003).

I.    THERE IS A STRONG PROBABILITY THAT PLAINTIFFS WILL SUCCEED ON THE
MERITS.

In order to satisfy the factor of the probability of success on the merits, a plaintiff "need
only raise questions going to the merits so serious, substantial, and doubtful as to make them fair
ground for litigation and thus for more deliberate investigation." *Foster-Helms v. Poole*, 2020
Tenn. Cir. LEXIS 377, *8 (No. 20C954, Davidson Cty. Cir. Ct., May 14, 2020). Thus, while a
plaintiff must show more than the mere possibility of success, a plaintiff is not required to prove
its case in full in order to obtain a temporary injunction. In this case, Plaintiffs have raised
significant issues and have asserted sufficient facts to support the probability that they will succeed
on the merits of their case.

A.    Plaintiffs have established a strong probability of success on the merits of their
claim for defamation based on Defendant's extensive and continued slander and
libel.

In Tennessee, the tort of defamation encompasses both libel and slander. In this case,
Plaintiffs' defamation claim is for both slander and libel. To establish a prima facie case of
defamation, a plaintiff must prove that: (1) a party published a statement; (2) with knowledge that
the statement was false and defaming to the other; or (3) with reckless disregard for the truth of
the statement or with negligence in failing to ascertain the truth of the statement. *Hibdon v.
Grabowski*, 195 S.W.3d 48, 58 (Tenn.Ct.App.2005) (citing *Sullivan v. Baptist Mem'l Hosp.*, 995
S.W.2d 569, 571 (Tenn.1999) (relying on Restatement (Second) of Torts § 580 B (1977))).

1.    Slander and Libel.

Slander is "the speaking of base and defamatory words which tend to prejudice another in
his reputation, office, trade, business, or means of livelihood." *Little Stores v. Isenberg*, 26
Tenn.App. 357, 172 S.W.2d 13, 16 (1943). Publication to a third party is an essential element of a

claim for slander. Little Stores, 172 S.W.2d at 16. "Publication is a term of art meaning the communication of defamatory matter to a third person. In the case of slander, 'publication' occurs when the defamatory matter is spoken." *Quality Auto Parts Co. v. Bluff City Buick*, 876 S.W.2d 818, 821 (Tenn.1994) (internal citations omitted). In addition, "only statements that are false are actionable [in a defamation case]; truth is, almost universally, a defense." *West v. Media Gen. Convergence, Inc*., 53 S.W.3d 640, 645 (Tenn.2001).

"A libel action involves written defamation." W. Page Keeton, Prosser and Keeton on Torts § 111, p. 771 (5th ed.1984*); Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc*., 876 S.W.2d 818, 820 (Tenn.1994). Broadcasts, however, "should be considered as libel; particularly if they are based on written scripts." *Ali v. Moore*, 984 S.W.2d 224, 227 (Tenn.Ct.App.1998). For a communication to be libelous, it must constitute a serious threat to the plaintiff's reputation. A libel does not occur simply because the subject of a publication finds the publication annoying, offensive or embarrassing. The words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule. They must carry with them an element "of disgrace." *Kersey*, 2006 WL 3952899, at *3 (quoting *Stones River Motors, Inc. v. Mid–South Pub. Co*., 651 S.W.2d 713, 719 (Tenn.Ct.App.1983)) (quoting W. Prosser, Law of Torts § 111, p. 739 (4th ed.1971)).

Here the slanderous and libelous statements by Defendant are numerous. Defendant repeatedly accuses COGIC leaders of "Fraud," "Grand Theft," and "Criminal Activity". He states, "Your actions were illegal, immoral, fraudulent and abusive," and predicts that leaders "will be wearing orange suits and preaching in Rykers prison." He also alleges "federal fraud" and predicts "the Feds will be going to Mason Temple soon." He claims COGIC officials "lied to the courts", that the General Counsel "lied to a court" and "attached false minutes", and made falsehoods to obtain restraining orders. He alleges national COGIC leaders are "stealing properties and money"

and that leadership was "TRYING TO STEAL control of another nonprofit". He specifically refers to the actions as "attempted GRAND THEFT." He explicitly states, "You are guilty of elder abuse against Bishop Sample", claiming the bishops "bullied" Bishop Sample and "withheld pay." The false accusations were distributed to dozens of third parties and online, including national officers, prominent COGIC figures (like Bishop Sexton, Bishop Dixon, Bishop Wooden, Mother Lewis, etc.), and local clergy and members across the country. (See Exhibits 1-7). He appears video uploads and public releases on social media. Defendant makes all of the above accusations and claims without ever presenting one shred of evidence in support thereof. Defendant is quick to accuse Plaintiffs of criminal, unethical, and sinful behavior, yet he is intentionally vague and ambiguous about the underlying facts that form the basis of these accusations.

Defendant, Moses Tyson, Jr., engaged in a widespread campaign of defamatory communications across multiple platforms—emails, social media, and YouTube interviews—each of which constitutes publication under Tennessee law. His defamatory statements were distributed to dozens of recipients per email, including bishops, pastors, church officers, and lay members across the country, and to thousands more through YouTube broadcasts and social media postings. Publication to third parties is indisputable and satisfies the essential element for both slander and libel. See *Quality Auto Parts Co. v. Bluff City Buick Co*., 876 S.W.2d 818, 821 (Tenn. 1994).

Further, Plaintiffs would assert that the above defamatory statements are categorically false. Neither Plaintiffs, nor any official of COGIC, have engaged in any illegal or unethical conduct in connection with Bishop Robert L. Sample, Holy Tabernacle Church, or any related matter. (Affidavit of Saffold – Exhibit 8). Further, as it pertains to Plaintiff Saffold, as a licensed attorney and officer of the court, his professional reputation and credibility are central to his ability to serve as General Counsel and to advise the national leadership of COGIC. Mr. Tyson's repeated

public accusations of criminality and dishonesty directly attack the integrity essential to Mr. Saffold's legal profession. (Affidavit of Saffold – Exhibit 8).

Plaintiffs are substantially likely to prevail because Defendant's statements are false assertions of criminal fact, not protected opinion, criticism, or hyperbole. Defendant repeatedly accused COGIC leadership of committing specific crimes—including "Grand Theft," "Fraud," "Elder Abuse," lying to judges, falsifying legal documents, and stealing property and funds from local churches—and asserted that Plaintiffs would "be wearing orange suits" in prison. Such allegations constitute defamation per se because they falsely charge Plaintiffs with serious crimes, unethical conduct, and moral turpitude. Defendant did not couch his statements as opinion, speculation, or religious disagreement; he represented them as "documented facts," "crimes," and "evidence" he possessed. Plaintiffs have submitted sworn affidavits confirming such accusations are wholly false. Accordingly, Plaintiffs will be able to prove falsity and satisfy the second element.

>    2.    Reputational and Financial Harm.

Finally, to establish any type of defamation claim, whether slander or libel, the claimant must prove that the defamation resulted in injury to the person's character and reputation. *Quality Auto Parts Co.*, 876 S.W.2d at 820 (citing Little Stores, 172 S.W.2d at 16). "To be actionable, the alleged defamatory statement must 'constitute a serious threat to the plaintiff's reputation.' " *Davis v. Tennessean*, 83 S.W.3d 125, 128 (Tenn.Ct.App.2001) (quoting *Stones River Motors, Inc. v. Mid–South Publ'g Co.*, 651 S.W.2d 713, 719 (Tenn.Ct.App.1983)). "It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation." *Spicer v. Thompson*, No. M2002–03110–COA–R3–CV, 2004 WL 1531431, at *5 (Tenn.Ct.App. July 7, 2004) (citing *Gobin v. Globe Publ'g Co.*, 232 Kan. 1, 649 P.2d 1239, 1243 (1982); 50

Am.Jur.2d Libel and Slander § 2 (1995)). Damages from false or inaccurate statements cannot be presumed; actual damages must be sustained and proved." *Davis*, 83 S.W.3d at 128 (citing *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn.1978)). "When looking at damages for a defamation suit this court has stated that, 'the issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering.' " *Murray v. Lineberry*, 69 S.W.3d 560, 564 (Tenn.Ct.App.2001) (citing *Myers v. Pickering Firm, Inc*., 959 S.W.2d 152, 164 (Tenn.Ct.App.1997)).

In the present matter, the defamatory statements have cause great harm to the various Plaintiffs. Mr. Tyson's statements were published to a national and international audience, including other bishops, clergy, and members of the Church, as well as the general public via YouTube and email dissemination lists reaching thousands of recipients. The defamatory accusations were also directed to and copied to individuals within the COGIC community, including pastors, attorneys, and officials who have ongoing professional dealings with COGIC. Because Defendant's accusations include allegations of felonious conduct, fraud, and dishonesty in Mr. Safford's profession, they constitute defamation per se under Tennessee law. (Affidavit of Saffold – Exhibit 8). Injury to Mr. Safford's reputation is presumed, and he have in fact suffered reputational harm and emotional distress as a result. (Affidavit of Saffold – Exhibit 8). Following the dissemination of Defendant's statements, Mr. Safford has been questioned by colleagues, bishops, and members of the public concerning the false accusations, resulting in reputational embarrassment and interference with his ability to carry out my duties. (Affidavit of Saffold – Exhibit 8). These inquiries have required Mr. Safford to issue clarifications and responses to preserve the credibility of the Church's legal department. He has personally observed the negative impact of Defendant's publications within the COGIC community. (Affidavit of Saffold – Exhibit

8). His false statements have eroded trust in Church governance, disrupted lines of authority, and caused confusion and discord among congregations. Defendant's conduct has caused irreparable harm to Plaintiffs' personal reputation, professional standing, and to the institutional integrity of the Church of God in Christ, Inc. The ongoing nature of his defamation continues to injure both Mr. Safford and the organization he serves. (Affidavit of Saffold – Exhibit 8).

Further, membership and income in local churches and jurisdiction have declined as a result of the above statements made by Defendant. (Affidavit of Willie Green – Exhibit 9). Some members and visitors to Mr. Green's church have told him that they left or will not come back as a result of the statements made by Defendant. Others have stated that they have a negative view of COGIC and Bishop Sheard as a result of Defendant's statements. (Affidavit of Willie Green – Exhibit 9).

Defendant Moses Tyson, Jr., is engaged in a malicious, ongoing, and widespread campaign of defamation *per se* against Plaintiffs by repeatedly and publicly accusing the organization's leadership of serious felonious crimes, specifically **"**Grand Theft," "Fraud," and "Elder Abuse," as well as statements regarding low moral character. In addition to the ongoing defamation, Defendant's conduct constitutes a direct and ongoing threat to the reputation and goodwill of the Church of God in Christ, Inc. Defendant has publicly invoked the COGIC name and his ecclesiastical credentials to lend false credibility to his defamatory claims, thereby misleading the public and causing confusion regarding the Church's official positions and actions. Because reputational and goodwill injuries are presumed irreparable under Tennessee and federal law, equitable intervention is necessary to prevent continuing dilution of the Church's brand, identity, and moral authority. Defendant's defamatory publications are disseminated nationally and internationally via mass emails, YouTube videos, and social media postings. This is not a single

past event, but a relentless and continuing course of conduct that causes daily, irreparable harm to Plaintiffs' ecclesiastical mission, corporate reputation, and essential charitable fundraising ability. Because the defamatory statements are ongoing and causing injury in the form of reputational damage, undermined spiritual authority, and lost charitable contributions—the value of which cannot be fully calculated or recovered after the fact, and continuingly—money damages alone are an inadequate remedy. The harm to Plaintiffs (destruction of public trust and financial injury to a worldwide religious organization) vastly outweighs the minimal harm to the Defendant, who would only be restrained from engaging in further unlawful, defamatory speech.

      B.    <u>Plaintiffs have established a strong probability of success on the merits of their claim for False Light Invasion of Privacy.</u>

Tennessee recognizes four types of invasion of privacy: "(a) unreasonable intrusion upon the seclusion of another ... (b) appropriation of the other's name or likeness ... (c) unreasonable publicity given to the other's private life ... (d) publicity that unreasonably places the other in a false light before the public...." Restatement (Second) of Torts § 652A(2) (1977); see, e.g., *Givens v. Mullikin*, 75 S.W.3d 383, 411 (Tenn.2002). Here, Plaintiffs' cause of action for invasion of privacy involves primarily an allegation of false light publicity. In *West v. Media Gen. Convergence, Inc*., 53 S.W.3d 640, 645 (Tenn.2001), the Tennessee Supreme Court expressly recognized the tort of false light invasion of privacy as set forth in Section 652E of the Restatement (Second) of Torts, which defines this tort as:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the

publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977).

The Court of Appeals has elaborated on the meaning of the term "publicity" as used in the

context of a false light claim:

> What is meant by the term "publicity" used in Section 652E? Comment a to Section 652E
> of the RESTATEMENT (SECOND) OF TORTS refers back to Comment a to Section
> 652D, which states:

> > "Publicity," as it is used in this Section, differs from "publication," as that term is
> > used in § 577 in connection with liability for defamation. "Publication," in that
> > sense, is a word of art, which includes any communication by the defendant to a
> > third person. "Publicity," on the other hand, means that the matter is made public,
> > by communicating it to the public at large, or to so many persons that the matter
> > must be regarded as substantially certain to become one of public knowledge. The
> > difference is not one of the means of communication, which may be oral, written
> > or by any other means. It is one of a communication that reaches, or is sure to reach,
> > the public.

> > Thus it is not an invasion of privacy, within the rule stated in this Section, to
> > communicate a fact concerning the plaintiff's private life to a single person or even
> > to a small group of persons.

*Secured Fin. Solutions, LLC v. Winer*, No. M2009–00885–COA–R3–CV, 2010 WL 334644, at *4

(Tenn.Ct.App. Jan. 28, 2010), perm. app. den. (Aug. 25, 2010). In *Winer*, the plaintiffs' false light

claim against the defendant was based on an email to a business associate and an oral statement to

another business associate, both of which allegedly implied that the plaintiffs' business was being

shut down by regulators. *Id*. at *1. The Court upheld the trial court's grant of summary judgment

on the plaintiffs' false light claim. *Id*. at *4. Because statements or disclosure to one person or a

small group of persons is not sufficient, the Court held that the defendant's "communication fails,

as a matter of law, to satisfy the 'publicity' requirement of the tort of false light invasion of

privacy." *Id*. See also 1 Rights of Publicity and Privacy § 5:114 (2d ed.) (updated March 2012)

("Thus, in a false light case, plaintiff must plead and prove that the matter was 'widely publicized .... [and] '[d]isclosure to just a few persons is not sufficient.'

In the present matter, Defendant's dissemination was not limited or private — it was widespread, intentional, and targeted to maximize exposure and humiliation. Defendant sent repeated mass emails to dozens of bishops, pastors, national leaders, and congregants, reaching an audience nationwide within COGIC and beyond; disseminated accusations through YouTube interviews to thousands of viewers on October 26 and October 30, 2025; and repeatedly urged recipients to share the materials broadly, guaranteeing further distribution.

These communications were directed to large groups of COGIC clergy and members and then to the general public on an international platform (YouTube), satisfying the "publicity" requirement many times over. Unlike the single-email communication rejected in *Winer*, Defendant's publications were deliberately broadcast to a vast and ever-expanding audience, making it "substantially certain" the accusations would become public knowledge.

Defendant's statements did more than defame Plaintiffs — they portrayed them before the public as corrupt, criminal, unethical, predatory, abusive, and spiritually unfit to lead. Such characterizations strike at the heart of Plaintiffs' identities as religious leaders and a faith-based institution.

Among other falsehoods, Defendant accused Plaintiffs of committing "fraud, grand theft, and abuse" against pastors and churches; engaging in "crimes" and "documented criminal behavior" that would result in "FEDS going to Mason Temple"; "lying to courts" to "steal properties"; "elder abuse" and using "goons" and "intimidation tactics"; and operating a "culture of corruption" worse than a "third-world Banana Republic." These are allegations of crimes

unsupported by any actual criminal offense reasonably supported in the language of the United States Code, Tennessee Annotated or _any_ state criminal penal offense.

Portraying the Presiding Bishop of a worldwide denomination, its Board of Directors, and its General Counsel as criminals, liars, and abusers — particularly to their congregants, peers, and the public — is highly offensive to a reasonable person. It undermines not only their character and professional integrity, but also their spiritual authority, moral standing, and credibility as leaders of a global religious body. No reasonable person would consider being falsely portrayed as a criminal, corrupt church official, or an abuser of the elderly as anything less than deeply humiliating, offensive, and damaging.

False light, like defamation, requires knowledge of falsity or reckless disregard for the truth. _West_, 53 S.W.3d at 647. Defendant's communications repeatedly demonstrate such reckless disregard. In the present matter, Defendant has asserted criminal allegations as "facts" while admitting uncertainty — stating, "IF anything I said … is not correct, PLEASE let me know so I can correct it"; claimed to possess "documents" and "files" proving his claims, yet has produced none; intentionally ignored church documents, bylaws, and factual records demonstrating his statements were false; and admitted his accusations were based on his "opinion" and belief in a "culture of corruption," not on verifiable evidence.

Defendant's explicit admission that his statements may be untrue confirms reckless disregard for their accuracy — he published first, sought truth later. Publishing unverified, sensational claims of criminal conduct to thousands of people and an international audience satisfies the "actual malice" threshold required for false light.

The widespread publicity, the highly offensive and humiliating false portrayal of Plaintiffs as criminals and abusers, and Defendant's reckless disregard for truth collectively establish a

strong probability that Plaintiffs will succeed on the merits of their false light invasion of privacy

claim.

      C.    <u>Plaintiffs have established a strong probability of success on the merits of their claim for Tortious Interference.</u>

The Tennessee Supreme Court expressly adopted the tort of intentional interference with

business relationships in *Trau–Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691 (Tenn. 2002).

The Court explained that the elements of the tort include the following:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Trau–Med*, 71 S.W.3d at 701 (footnotes and citation omitted).

In the present matter, COGIC, as a national religious denomination, maintains ongoing

business and economic relationships with its member churches, pastors, jurisdictions, bishops, and

congregants—relationships essential to its governance, funding, charitable operations, and

ministry support. These include donations, apportionments, jurisdictional funding, and national

ministry offerings. Defendant's communications were specifically targeted at these individuals,

including bishops, pastors, members, and church officers, demonstrating interference with existing

and prospective economic relationships.

Defendant is a COGIC pastor with decades of involvement in COGIC's ecclesiastical

structure. He specifically identified national leadership, bishops, pastors, and local congregations

as his target audience. His emails show clear knowledge of the financial and organizational

relationship between COGIC headquarters and its churches, referring to "dues," "national

conventions," "legal obligations," and "trust clauses." Defendant's own correspondence proves he

targeted those relationships intentionally, as he emailed bishops, pastors, jurisdictional officers, and congregational leaders across the U.S. to discourage affiliation and financial participation.

Defendant's statements go beyond mere commentary; they explicitly urge churches and leaders to sever ties with COGIC and cease financial support to the national organization. For example, he advised one congregation to withdraw from COGIC, eliminate any reference to COGIC governance, and refuse to comply with directives of the Presiding Bishop. The interference was not incidental — it was purposeful and explicit. This demonstrates a calculated intent to disrupt the financial and cooperative relationships that sustain COGIC's ministry and operations.

Under *Trau–Med*, "improper means" include "fraud, deceit, misrepresentation, defamation, and illegal conduct." Defendant's campaign was rooted in the mass dissemination of false, defamatory accusations of criminal activity, theft, fraud, elder abuse, and corruption. He used mass email blasts, social media, and YouTube interviews to publicly smear COGIC leadership, intentionally incite distrust, and encourage rebellion against church governance. These actions constitute improper means as a matter of law because they rely on false criminal accusations, defamation, coercion, and intimidation, not legitimate critique. Further, Defendant acted with improper motive—seeking to damage the credibility, authority, and governance of COGIC leadership, and to elevate himself as an alternative voice of authority to COGIC members and pastors.

Plaintiffs have already experienced loss of membership confidence, confusion within congregations, reputational damage, and a decline in charitable financial support essential to the denomination's operations. Defendant's conduct has caused measurable interference with financial contributions, ministry partnerships, and the ability of the General Board and General

Counsel to effectively govern and conduct business on behalf of COGIC. These damages are ongoing and escalating.

Plaintiffs have clearly demonstrated a likelihood of success because Defendant's conduct meets every *Trau–Med* element and has already caused substantial harm to COGIC's financial, operational, and ecclesiastical relationships. Preliminary injunctive relief is therefore appropriate.

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs have more than satisfied the standard for injunctive relief under Tenn. R. Civ. P. 65.04. The evidence clearly demonstrates that Defendant's ongoing campaign of false, malicious, and widely-publicized defamatory statements has caused, and will continue to cause, immediate and irreparable harm to Plaintiffs' reputations, spiritual authority, ecclesiastical governance, and financial stability. The injury suffered is not speculative, but real, present, and escalating daily. No adequate remedy at law exists that could repair the widespread reputational damage, loss of goodwill, disruption of ecclesiastical order, and decline in charitable support resulting from Defendant's continued misconduct.

The balance of equities also strongly favors Plaintiffs. Granting the injunction will impose no undue burden on Defendant, as it merely restrains him from engaging in unlawful, defamatory conduct—speech *which enjoys no constitutional protection.* In contrast, denying injunctive relief would permit Defendant to persist in disseminating baseless accusations of criminality, fraud, and corruption to thousands of church members and the public, magnifying irreparable injury.

Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claims for defamation, false light, and tortious interference, each of which is independently sufficient to support injunctive relief. Finally, the public interest strongly supports the issuance of a preliminary injunction. Religious organizations of this size and prominence provide vital spiritual, charitable,

and community services. Preventing the spread of false criminal accusations, preserving the integrity of ecclesiastical governance, and safeguarding the public from misinformation directly serve the public good.

Accordingly, Plaintiffs respectfully request that this Court grant the Preliminary Injunction in full, restraining Defendant, and all persons acting in concert with him, from further publishing, broadcasting, or disseminating any defamatory statements concerning Plaintiffs pending final resolution of this matter.

Respectfully submitted,


 s/Taurus Bailey_____
Taurus M. Bailey, BPR #24303
Bailey & Bailey, PLLC
44 N. 2nd Street, Suite 502
Memphis, TN 38103
901-575-8702 x. 3
taurus@baileybaileylaw.com


## CERTIFICATE OF CONSULTATION

I hereby certify that, pursuant to Local Rule 7.2(a)(1)(B), I have consulted with the *pro se* Defendant, Moses Tyson, Jr., regarding this Motion.

After conferring with the Defendant, Moses Tyson, Jr., on November 11, 2025, via email regarding this Motion, the Defendant opposes the continuation of the Temporary Restraining Order and the setting of a hearing for a Preliminary Injunction.

## CERTIFICATE OF SERVICE

I, Taurus Bailey, declare as follows:

On November 11, 2025, I caused to be served upon pro se Defendant Moses Tyson, Jr., pro se Defendant, by electronic mail, the following document(s): Plaintiffs' Brief In Support Of Preliminary Injunction Post Removal From Shelby County Chancery Court on November 11, 2025.

 s/Taurus Bailey_____
Taurus Bailey, Attorney At Law