**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

CHURCH OF GOD IN CHRIST, INC.,
BOARD OF DIRECTORS *also known as*
General Board of Church of God in Christ, Inc,
and JONATHAN SAFFOLD, JR *Individually and
General Counsel of Church of God in Christ, Inc*,

      Plaintiffs,

v.                                                                    Case No. 2:25-cv-03029-MSN-cgc

MOSES TYSON, JR.,

      Defendant.

---

### ORDER DENYING DEFENDANT'S MOTION TO DISMISS

---

Before the Court is Defendant's Motion to Dismiss (ECF No. 15), filed December 30, 2025. For the reasons given below, Defendant's Motion to Dismiss is **DENIED**.

### PROCEDURAL HISTORY

Plaintiffs filed their Complaint in Shelby County Chancery Court on October 31, 2025. (ECF No. 1-3 at PageID 9–21.) Defendant removed that case, invoking federal diversity jurisdiction, to this Court on November 10, 2025 (ECF No. 1), with Plaintiffs moving for a preliminary injunction a day later, on November 11, 2025. (ECF No. 9.) Though Defendant did not respond to the Motion for Preliminary Injunction, he did file a Motion to Dismiss (ECF No. 15) on December 30, 2025. On January 6, 2026, this Court held a hearing on the Motion for Preliminary Injunction. (ECF Nos. 18, 19.) Plaintiffs responded to the Motion to Dismiss on

January 14, 2026 (ECF No. 21), and Defendant has not filed a reply. The Court then entered an Order Granting Preliminary Injunction (ECF No. 22) on February 2, 2026.[1]

## BACKGROUND

Plaintiff COGIC is "a non-profit, ecclesiastical corporation organized under the laws of the State of Tennessee, with its headquarters in Tennessee." (ECF No. 1-3 at PageID 10.) More specifically, it is "a Christian organization in the Holiness-Pentecostal tradition and is the largest Pentecostal denomination in the United States." (ECF No. 9-1 at PageID 93.) Plaintiff General Board is a "senior governing bod[y] of COGIC," and "part of the Executive Branch of COGIC in Memphis, Tennessee." (ECF No. 1-3 at PageID 11; ECF No. 9-1 at PageID 93.) Bishop John Drew Sheard is COGIC's Presiding Bishop, an agent thereof, and the "leader of the worldwide organization." (ECF No. 1-3 at PageID 3; ECF No. 9-1 at PageID 93.) Jonathan Saffold, Jr. is COGIC's general counsel. (ECF No. 1-3 at PageID 11.)

Defendant Moses Tyson, Jr. has longstanding associations with COGIC, its leadership, and its members. He has served as a bishop and pastor in the COGIC community. Mr. Tyson has also "performed and recorded with countless gospel, soul, funk, R&B, and inspirational artists," "put[]

---

[1] Though not relevant for the present Order, on March 3, 2026, Defendant moved to alter or amend the preliminary injunction (ECF No. 25); Plaintiffs responded in opposition on March 16, 2026 (ECF No. 26), and Defendant filed his reply on April 6, 2026. (ECF No. 30.) Plaintiffs then moved for sanctions on April 6, 2026. (ECF No. 29.) Defendant responded in opposition, also on April 6, 2026 (ECF No. 31), and Plaintiffs filed their reply with leave of the Court on April 29, 2026. (ECF No. 36.)

2

together his own albums[,] and set[] up his own independent label." (ECF No. 9-1 at PageID 93–94.)

Plaintiffs bring claims against Mr. Tyson for defamation, false light invasion of privacy, tortious interference, and civil conspiracy based on allegedly defamatory emails, social media statements, and video interviews. (ECF No. 1-3.) These are, Plaintiffs assert, part of a "false campaign involv[ing] reckless allegations of serious, felonious crimes." (*Id.* at PageID 12.) "Defendant's publications were disseminated nationally and internationally via mass emails, YouTube videos, and social media postings . . . reach[ing] vast numbers of individuals, including COGIC members, clergy, and the general public." (*Id.*) The statements Defendant made accused Plaintiffs of being "thieves," "engaging in grand theft" and "elder abuse." (*Id.*)

On July 15, 2025, Defendant sent an email to over 30 people alleging crimes by COGIC and its leadership, including accusations of perjury, fraud, theft, and abuse. (ECF No. 9-2.) On July 27, 2025, the Defendant sent an email to 30 individuals accusing COGIC and its agents of taking "MILLIONS IN THEFT," selling "STOLEN CHURCH PROPERTIES," and lying to "the Judge in Houston, just like [they] 'LIED' to the Judge in Florida." (ECF No. 9-4 at PageID 121–23.) On August 17, 2025, Defendant sent another email again accusing COGIC and Bishop Sheard of "trying to STEAL HTC CORPORATE CONTROL" and accusing them of lying "TO THE COURT." (ECF No. 9-3 at PageID 119.) He further states that COGIC leadership and Bishop Sheard should be reported "to the POLICE FOR ELDER ABUSE." (*Id.* at PageID 120.)

On August 29, 2025, he sent another email to numerous individuals accusing Bishop Sheard of running a scam via "LIES" and "FRAUD." (ECF No. 9-6 at PageID 128.) He continues to accuse Bishop Sheard and associates of "CRIMES in the REAL WORLD," such as "LYING TO COURTS" to "STEAL CONTROL of properties." (*Id.* at PageID 128–29.) On September 6,

3

2025, he sent yet another email to over 50 people that accused Bishop Sheard of "FRAUDULENT BULLYING TACTICS," asserting that there were "LEGITIIMATE CHARGES filed against" him as a result of attempts to "steal control" of properties in a COGIC-affiliated community.  (ECF No. 9-7 at PageID 131–32.)  Again, on October 29, 2025, Defendant sent another email to more than 30 people accusing COGIC leadership generally of "INTIMIDATION TACTICS," and Bishop Sheard and Mr. Saffold specifically of "ILLEGAL, FRAUDULENT" actions in relation to "ABUSE . . . against Bishop Sample."  (ECF No. 9-8 at PageID 136.)  He further accuses Mr. Saffold of "FRAUD, LIES & ABUSE," including suggestions of perjury and material misrepresentation.  (*Id.*)

Then, there are Defendant's interviews, posted on YouTube.  On October 26, 2025, the Defendant appeared on The Juice Radio and Talk Show for a panel discussion that now has over 24,000 views.  The Juice Radio and Talk Show, *COGIC Lawsuit Explained! Moses Tyson Jr Shares Information He's Being Sued by COGIC* (YouTube, Oct. 26. 2025, https://www.youtube.com/watch?v=kDfuxaiUOS4).  During that appearance, Defendant accuses COGIC of, among other things, "ripping off" over $600,000, *id.* at 5:05–5:10, and trying to "steal [] property." *Id.* at 7:25–7:35.  Four days later, on October 30, 2025, the Defendant appeared on the same show for a one-on-one interview that now has over 6,700 views.  The Juice Radio and Talk Show, *Moses Tyson Jr Speaks Out About The COGIC Lawsuits and Why He Won't Back Down from COGIC Leadership* (YouTube, Oct. 30, 2025, https://www.youtube.com/watch?v=qD7LiJx4upg).  During that appearance, Mr. Tyson says COGIC has "illegally taken" churches, *id.* at 13:48–52, "illegally removed" pastors, *id.* at 13:55–13:58, tried to take local church properties, *id.* at 14:04–14:10, and "submit[ted] false information

to the court." *Id.* at 14:10–14:14.  Defendant also accuses COGIC agents of being "abusive."  *Id.* at 22:09–22:17.

As a result of these accusations disseminated to the general public and COGIC faithful in particular, Plaintiffs allege "profound[] damage[e] to Plaintiffs' reputations" and "ongoing, irreparable . . . financial harm."  (ECF No. 1-3 at PageID 12.)  Included in this is "direct[] interfere[nce] with" COGIC's income via charitable contributions. (*Id.* at PageID 13.)  Per Bishop Willie Green, a member of the Board of Bishops with responsibility for overseeing COGIC-affiliated churches in North Florida and South Alabama, "membership and income in [] local churches . . . have declined as a result of the [] statements made by Mr. Tyson." (*Id.* at PageID 17.)  With regard specifically to Mr. Saffold, Mr. Tyson's statements have caused emotional distress and reputational harm "within the legal community"; he has been "questioned by colleagues, bishops, and members of the public."  (ECF No. 9-9 at PageID 139–40.)

**<u>DEFENDANT'S MOTION TO DISMISS</u>**

1. <u>Legal Standard</u>

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).  Using this framework, the court determines whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

A complaint need not contain detailed factual allegations; however, a plaintiff's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).   In other words, the "[f]actual allegations must be enough to raise a right to relief above [a] speculative level." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).   If a court decides in light of its judicial experience and common sense, that the claim is not plausible, the case may be dismissed at the pleading stage. *Iqbal*, 556 U.S. at 679.   "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 556.

Courts may "consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein" while ruling on a 12(b)(6) motion to dismiss.[2] *Hodges v. City of Grand Rapids*, 139 F.4th 495, 510 (6th Cir. 2025) (quoting *Bassett*, 528 F.3d at 430).

---

[2] Accordingly, the Court considers the exhibits attached to Plaintiff's Motion for Preliminary Injunction (ECF No. 9) as "items appearing in the record of the case," and as items "referred to in the Complaint and central to the claims contained therein." *See also Witzke v. Donofrio*, No. CV 20-12594, 2021 WL 22467, at *2 n.4 (E.D. Mich. Jan. 4, 2021) (quoting *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008)) (considering exhibits attached to a defendant's response to a motion for preliminary injunction as "items appearing in the record" for purposes of a motion to dismiss); *Spurlock v. Ashland Indep. Schs. Bd. of Educ.*, No. CV 23-124-DLB-EBA, 2024 WL 3625657, at *4 (E.D. Ky. July 31, 2024) (concluding that briefing and exhibits accompanying a motion for injunctive relief did not convert a motion to dismiss into a motion for summary judgment).   The Court notes here, as it has previously, that "Defendant never responded to the Emergency Motion [for a Preliminary Injunction] and defense counsel elected not to question any of the individuals who testified at the January 6 Hearing." (ECF No. 22 at PageID

2. <u>Analysis</u>

Defendant's Motion to Dismiss (ECF No. 15) purports to justify rejecting Plaintiffs' Complaint in its entirety for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 15-1 at PageID 160.) But Defendant addresses only Count I, the claim for defamation. (*See generally id.*) The motion says nothing about Plaintiffs' other asserted claims: false light invasion of privacy, tortious interference with charitable and ecclesiastical relations, and civil conspiracy. Accordingly, the Court treats Defendant's motion as a *partial* motion to dismiss Count I only.

  a. Defendant's statements are not protected by the First Amendment

First, Defendant claims that Plaintiffs' claims are barred by the First Amendment, which protects Defendant's statements: as rhetorical hyperbole and opinion, as religious commentary and ecclesiastical speech, as speech on matters of public concern, and from prior restraint. (ECF No. 15-1 at PageID 162–64.) The Court treats each of these in turn.

Under Tennessee law, "the issue of whether a communication is capable of defamatory meaning is a question of law for the court to decide in the first instance." *Moses v. Roland*, No. W201900902COAR3CV, 2021 WL 1140273, at *10 (Tenn. Ct. App. Mar. 25, 2021) (quoting *Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 708–09 (Tenn. Ct. App. 2012)). But to do so, courts "must look to the words themselves." *Id.* (quoting *Davis v. Covenant Presbyterian Church of Nashville*, No. M2014-02400-COA-R9-CV, 2015 WL 5766685, at *4 (Tenn. Ct. App. Sept. 30, 2015)). Notwithstanding Tennessee's standards, however, *no* statements are actionable as defamatory—"and are protected by the First Amendment—if they cannot 'reasonably be

_____

197.) Nor did Defendant object to *any* of the exhibits Plaintiffs moved to enter into the record at the time.

7

interpreted as stating actual facts.'" *Armstrong v. Shirvell*, 596 F. App'x 433, 441 (6th Cir. 2015)

(quoting *Joliff v. N.L.R.B.*, 513 F.3d 600, 610 (6th Cir. 2008)).   And to determine whether a

statement may be "read as stating an actual fact or is instead protected hyperbole," courts within

the Sixth Circuit examine:

> (1) The common usage or meaning of the allegedly defamatory words themselves, whether they are commonly understood to be loose, figurative, or hyperbolic words;
>
> (2) The degree to which the statements are verifiable, whether the statement is objectively capable of proof or disproof;
>
> (3) The immediate context in which the statement occurs; and
>
> (4) The broader social context into which the statement fits.

*Id.* at 441–42 (citing *Joliff*, 513 F.3d at 610–12).

Applied to this case, the alleged statements *are* capable of defamatory meaning "because

they can reasonably be interpreted as conveying actual facts." *Id.* at 442.  Indeed, Defendant has

accused Plaintiffs of crimes like fraud, theft, and elder abuse. (*See, e.g.*, ECF No. 9-8 at PageID

136.)   These are terms not often or commonly understood to convey hyperbole, nor are they

typically loose and figurative.   The accusations are also objectively verifiable—fraud, theft,

perjury, and elder abuse have objective, legal meanings with accompanying consequences.  Either

the Plaintiffs are guilty of the crimes alleged or they are not, and Defendant's claims can therefore

be proved or disproved.  Additionally, the context suggests that Defendant took the initiative to

compose emails *for the purpose* of alleging criminal behavior on the part of Plaintiffs.  Not just

this, but Defendant is alleged to have participated in interviews on the very subjects at issue here—

in other words, not a context in which one would expect hyperbolic or figurative accusations of

criminal behavior.  Accordingly, Defendant's statements are not protected opinion or hyperbole

under the First Amendment.

Next, Defendant invokes the "ecclesiastical abstention" (or "court autonomy") doctrine, arguing that "[t]he Complaint arises from internal church disputes over succession, governance, and authority," and that Plaintiffs seek to use the present suit as a "vehicle to resolve disagreements" about ecclesiastical matters. (ECF No. 15-1 at PageID 163, 165–66.) To be sure, courts acknowledge that the First Amendment "limits the power of the courts to hear suits 'whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by . . . church judicatories . . . .'" *Ogle v. Hocker*, 279 F. App'x 391, 395 (6th Cir. 2008) (quoting *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 727 (1871)). And "[w]hether a secular court may hear a tort suit despite the church autonomy doctrine turns on the availability of secular standards and the ability of a court to resolve the controversy without reference to religious doctrine." *Id.* Because "the laws of defamation . . . can be applied based solely on secular rules . . . the relevant question [] is whether the court would interfere with any matters of church doctrine or practice by ruling on this case." *Id.* at 395–96.

Defendant claims that ruling on Plaintiffs' defamation claim would force the Court to wade into questions of church governance, doctrine, and policy. But this improperly frames the Complaint. Plaintiffs do not seek adjudication of their actions in the context of COGIC's ecclesiastical norms—instead, they ask the Court to determine whether Defendant falsely accused them of crimes. Fraud, theft, perjury, and elder abuse have definitions that require no examination of religious doctrine, and the mere fact that the allegations were made in the context of ecclesiastical disputes is not relevant.[3] A crime is a crime, whatever the context. As in *Hocker*, the only issue is whether Defendant's "purported factual statements . . . were falsehoods that

---

[3] Of course, it is also true, as Plaintiffs point out, that most of the "defamatory statements occurred outside religious practice" as well. (ECF No. 21 at PageID 188.)

harmed" Plaintiffs. *Id.* at 396. Thus the ecclesiastical abstention doctrine does not preclude the Court from adjudicating Plaintiffs' defamation claim.

Then, Defendant argues that his communications were protected as "speech on matters of public concern." (ECF No. 15-1 at PageID 163.) It is undisputed that "speech on matters of public concern is at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (citation omitted) (cleaned up). To determine whether speech addresses matters of public concern, courts "examine the content, form, and context of that speech." *Id.* at 453 (citation omitted). And the examined speech "deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Id.* (citation omitted). Should a court determine that the speech in question *does* address matters of public concern, a plaintiff must show that the speaker "acted with actual malice." *Charles v. McQueen*, 693 S.W.3d 262, 280 (Tenn. 2024); *see also West v. Media General Convergence, Inc.*, 53 S.W.3d 640, 647 (Tenn. 2001) (citing *Time, Inc. v. Hill*, 385 U.S. 374 (1967)) (acknowledging that the Supreme Court "extended the actual malice standard to alleged defamatory statements about matters of public concern"). "The actual malice fault standard is a subjective one in which the ultimate question is whether the defendant made the statement with knowledge that the statement was false or with reckless disregard for the truth." *Hunt v. S. Baptist Convention*, 777 F. Supp. 3d 776, 820 (M.D. Tenn. 2025) (quoting *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 531 (6th Cir. 2014)).

Looking at the content of Defendant's speech in this case, there can be no question of its relevance to matters of public concern. Criminal conduct by COGIC and its leaders would be of the utmost importance to the millions of faithful across the country (and the world). Plaintiffs themselves acknowledge this: "[Defendant's] characterizations strike at the heart of Plaintiffs'

10

identities as religious leaders and a faith-based institution." (ECF No. 9-1 at PageID 110.)  Indeed,

if the allegations were true, Plaintiffs say, they would be "spiritually unfit to lead." (*Id.*)  The form

of Defendant's speech also supports the conclusion that he was addressing matters of public

concern, chiefly in the two YouTube interviews he gave.  It would be fair to say that Defendant

intended to reach as many people as possible in such public appearances—given the tens of

thousands of views, it would seem he was successful.  Finally, the Court reaches the same

conclusion upon consideration of the context of Defendant's written and spoken remarks.  There

are, obviously, ongoing disputes within the COGIC community about decisions regarding

finances, church administration, and transparency, with some of the faithful, including Mr. Tyson,

taking a dim view of present leadership.  It is in this context that Defendant has made accusations

of crime.  Accordingly, having appropriately considered the record, the Court concludes that

Defendant *did* address matters of public concern, and that therefore his statements are entitled to

heightened protection under the First Amendment.

Defendant would have the Court end the analysis right there. But that leaves the job half-

done.  The question remains: have Plaintiffs alleged sufficient facts to show that Defendant acted

with actual malice?  Actual malice may be shown if a defendant "entertained serious doubts as to

the truth of the statements," *Finney v. Jefferson*, No. M201900326COAR3CV, 2020 WL 5666698,

at *5 (Tenn. Ct. App. Sept. 23, 2020) (citation omitted), "with a high degree of awareness of . . .

probable falsity," *id.* (citation omitted), or otherwise "acted with purposeful avoidance of the

truth." *Id.* (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989).

Here, Plaintiffs clearly state that Mr. Tyson knew or should have known the allegations of

criminal conduct were false and that he "acted without any . . . good faith belief in the truth of his

statements." (ECF No. 1-3 at PageID 12.)  Nothing in the record as yet suggests that Defendant

investigated the truth of his statements before publishing them.  Furthermore, in one of Mr. Tyson's emails, he admits that the allegations may be false, writing that "'IF' anything I said in this attached interview is not correct, PLEASE let me know, so I can correct it."  (ECF No. 9-8 at PageID 137.) In other words, Plaintiffs sufficiently allege that Defendant was aware of "obvious reasons to doubt the veracity . . . or the accuracy of the" statements he made, and that he therefore engaged in "purposeful avoidance of the truth" meeting the actual malice standard.  *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 301 (Tenn. Ct. App. 2007) (citing *Harte-Hanks*, 491 U.S. at 688, 692), *abrogated on other grounds*, *Burke v. Sparta Newspapers, Inc.*, 592 S.W.3d 116, 123 (Tenn. 2019).  Thus, while the Court agrees with Defendant that the speech in question addressed matters of public concern, the defamation claim survives because Plaintiffs have alleged sufficient facts to show actual malice.

Defendant's final constitutional argument addresses Plaintiffs' request for injunctive relief, claiming that such would constitute a prior restraint, the "most serious and the least tolerable infringement on First Amendment rights." (ECF No. 15-1 at PageID 163 (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)).)  But the admonition against prior restraints and the issuance of injunctions in defamation cases is not absolute; indeed, the Sixth Circuit has recognized that, at least in certain circumstances, "an injunction is necessary to prevent future injury to [] personal reputation and business relations" so long as its application is limited to "the statements which have been found . . . to be false and libelous." *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1209 (6th Cir. 1990) (Wellford, J., majority opinion as to injunctive relief, concurring in part and dissenting in part); *see also In re Conservatorship of Turner*, No. M2013-01665-COA-R3CV, 2014 WL 1901115, at *20 (Tenn. Ct. App. May 9, 2014) (adopting the "modern rule" that "defamatory speech may be enjoined after a determination that the speech is, in fact, false,"

12

reasoning that "because defamatory speech is not protected by the First Amendment, such an injunction does not violate the amendment's guarantee of free speech"); *Mid-Am. Apartment Communities, Inc. v. Philipson*, No. 2:23-CV-02186-SHL-CGC, 2024 WL 1178131, at *8 n.11 (W.D. Tenn. Mar. 19, 2024) ("[N]arrow injunctions against false and defamatory speech are permissible without contravening the First Amendment's general prohibition on prior restraints.").

To Plaintiffs' credit, this is exactly the sort of injunction sought. They only seek to enjoin future iterations of "already published defamatory statements that continue to circulate and cause harm." (ECF No. 21 at PageID 186.) Accordingly, Defendant's final First Amendment argument fails.

> b. The truthfulness of allegedly defamatory statements cannot defeat Plaintiffs' claims at the pleading stage

Defendant would have the Court resolve Plaintiffs' defamation claim, alternatively, on the ground that "truth is a complete defense to defamation." (ECF No. 15-1 at PageID 164.) Defendant is undoubtedly correct that the truth of a statement is a defense to any claim that such statement is defamatory. "In defamation law only statements that are false are actionable" and "truth is, almost universally, a defense." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645–46 (Tenn. 2001) (quoting *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 83 (1984)). And it may very well be that none of Defendant's statements at issue in this case are false, and that therefore Plaintiffs' defamation claim will fail. But undertaking to determine the truth of Defendant's statements at this stage would contravene the entire legal framework surrounding motions to dismiss.

The Court will restate here what it wrote above regarding the applicable legal standard. In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court will "construe

the complaint in the light most favorable to the plaintiff, *accept its allegations as true*, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (emphasis added). A court determines whether the complaint alleges "sufficient factual matter, *accepted as true*, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Accordingly, Defendant's defense of his statements as true is premature.

      c.   Plaintiffs have plead defamation with sufficient specificity

Next, Defendant argues that Plaintiffs have not made allegations sufficiently specific to support a claim for defamation. (ECF No. 15-1 at PageID 166.) Plaintiffs' allegations, he says, are "conclusory assertions" and lack "specific allegations of false statements." (*Id.*)

Under Tennessee law, defamation takes the forms of libel and slander, "libel being written defamation and slander being spoken defamation." *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (citing *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 820 (Tenn. 1994)). "To establish a *prima facie* case of defamation, a plaintiff must prove that: (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999) (citations omitted). Finally, "[u]nder Tennessee law, a plaintiff is required to prove actual damages in all defamation cases." *Hibdon*, 195 S.W.3d at 68 (citing *Handley v. May*, 588 S.W.2d 772, 776 (Tenn. Ct. App. 1979).

So, within this framework, Defendant seems first to be arguing that none of Plaintiff's allegations constitute a sufficiently specific identification of a false statement. The Court disagrees. Plaintiffs' Complaint alleges statements accusing them of being "thieves," engaging in

14

"grand theft," and committing "fraud" and "elder abuse." (ECF No. 1-3 at PageID 12–13.) The exhibits attached to the Complaint bear this out. Bishop Willie Green "read and/or heard Mr. Tyson making statements accusing [Plaintiffs] of committing the crimes" mentioned. (ECF No. 1-3 at PageID 17.) Mr. Tyson's October 24, 2025, email to Plaintiff's counsel contains the very same accusations. (*Id.* at PageID 20–21.) And repeated examples of those same accusations and statements may be found littered throughout "items appearing in the record of the case" that "are referred to in the Complaint and are central to the claims contained therein." *Hodges*, 139 F.4th at 510. Here are just a few examples:

- Defendant accuses Plaintiffs of "trying to STEAL HTC CORPORATE CONTROL" and of having "LIED TO THE COURT trying to steal WEST SIDE FOR YEARS." (ECF No. 9-3 at PageID 119.)

- Defendant accuses COGIC, through unidentified agents, of "MILLIONS IN THEFT," having "STOLEN CHURCH PROERTIES SOLD . . . and worse." (ECF No. 9-4 at PageID 122.)

- Defendant accuses the General Board of colluding with "the BOARD OF BISHOPS EXECUTIVE COMMITTED, GEN COUNSEL [Saffold] & OTHERS, to 'DEFRAUD BISHOP KYLES.'" (*Id.*)

- Defendant elaborates on Plaintiffs' "HISTORY of LYING TO COURTS, in order to 'STEAL CONTROL' of properties and ministries." (ECF No. 9-6 at PageID 129.)

In short, Plaintiffs have identified numerous specific statements of fact that they contend are false, that go well beyond conclusory assertions.

Next, Defendant claims that Plaintiffs have failed to plead damages with specificity, again relying on "conclusory allegations." (ECF No. 15-1 at PageID 167–68.) Not so. Mr. Saffold

15

indicated that he had been "questioned . . . concerning the false accusations, resulting in reputational embarrassment," and had "personally observed . . . eroded trust in Church governance, disrupted lines of communication, and [] confusion and discord among congregations." (ECF No. 9-9 at PageID 140.)  Bishop Green's affidavit also confirms a drop in attendance as a result of reputational damage to Plaintiffs, as well as a reduction in charitable giving.  (*See* ECF No. 1-3 at PageID 17 ([M]embers and visitors . . . will not come back as a result of the statements made by Mr. Tyson."); *id.* ("[M]embership and income in my local churches and jurisdiction have declined as a result of the [] statements made by Mr. Tyson.").)  While the Court could wish for a little more to be fleshed out in the pleadings, Plaintiffs have done enough to survive under Rule 12(b)(6).

d.  Plaintiffs' failure to plead defamation per se is immaterial

Finally, Defendant argues that Plaintiffs have failed to establish that damages are to be presumed because his statements do not constitute "defamation per se" under Tennessee law. (ECF No. 15-1 at PageID 167.)  As an initial point, both for Plaintiffs' and Defendant's benefit, the Court calls their attention to the fact that the Tennessee Supreme Court has "[a]bandon[ed] presumed damages in relation to reputational harm," instead determining that a "plaintiff must plead [] injury from the alleged defamatory words." *Blythe v. Forsythe*, No. M2023-01463-COA-R3-CV, 2025 WL 3095415, at *8 (Tenn. Ct. App. Nov. 6, 2025) (quoting *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978)).  Second, Defendant's real argument is just a repackaging of his First Amendment arguments, claiming that "Defendant's communications were framed as opinion, advocacy, and rhetorical hyperbole," and therefore could not constitute defamatory speech at all.  (ECF No. 15-1 at PageID 167.)  But as the Court has already determined, Defendant's statements are not protected opinion or hyperbole under the First Amendment, but rather are capable of defamatory meaning and objectively verifiable.  Finally, as also explained

16

above, Plaintiffs have sufficiently pled damages, which would make a defamation per se pleading redundant even if Tennessee still recognized such a cause of action.

## **CONCLUSION**

Therefore, for all of the reasons given above, Defendant's Motion to Dismiss (ECF No. 15) is **DENIED**.

**IT IS SO ORDERED**, this 5th day of August, 2026.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE